**Ronald O. NELSEN; Michael Bullene,
Plaintiffs–Appellants,**

v.

**KING COUNTY, Defendant–Appellee.**

No. 87–4411.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 3, 1989.

Decided Feb. 9, 1990.

Roger M. Leed, Seattle, Wash., for plaintiffs-appellants.

Norm K. Maleng, King County Pros. Atty. by James L. Brewer, Sr. Deputy Pros. Atty., and Mary F. Perry, Deputy Pros. Atty., Seattle, Wash., for defendant-appellee.

Before WALLACE, PREGERSON and ALARCON, Circuit Judges.

WALLACE, Circuit Judge:

Nelsen and Bullene, former residents of the Cedar Hills Alcoholic Treatment Center (Center), appeal from the district court's refusal of class certification and denial of injunctive relief. The district court held that Nelsen and Bullene did not possess standing to seek injunctive relief individually or on behalf of a class. The district court had jurisdiction pursuant to 42 U.S.C. § 1983. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1292(a)(1). We affirm.

I

Following the commission of alcohol-related offenses, Nelsen and Bullene chose, in lieu of prison, to undergo treatment in the Center, which is owned and operated by King County. Nelsen resided in the Center from April 2 to May 30, 1985. Bullene resided in the Center from September 26 to November 24, 1986.

On August 25, 1986, Nelsen and Sharp, another former resident of the Center (who is not involved in this appeal), filed suit in the district court under 42 U.S.C. § 1983, seeking injunctive relief and damages for alleged violations of their constitutional rights during their stays in the Center. The substance of their complaint focused on the allegedly unsanitary conditions created by a landfill located next to the Center. Nelsen and Sharp sought monetary damages for the alleged violation of their rights and an injunction to relocate the Center in an area away from the landfill.

On December 29, 1986, Nelsen and Sharp filed a motion to certify a class consisting of "[a]ll persons who have been resident patients at the [Center] for a period beginning three years prior to the filing of this action, and also all persons who shall in the future be patients, whether involuntarily committed or not." On March 16, 1987, Nelsen and Sharp filed a second amended complaint, containing new allegations regarding the adequacy of the treatment they received at the Center and adding Bullene as a plaintiff. Neither Nelsen nor Bullene were residing in the Center during the time that they were parties to the lawsuit. Their claims of standing are thus predicated upon the supposition that they will at some point return to the Center.

The district court denied Nelsen and Bullene's motion for class certification, and dismissed their claims for injunctive relief. The district court reasoned that certification of the class pursuant to Fed.R.Civ.P. 23(b)(2) was improper because Nelsen and Bullene lacked standing to assert claims for injunctive relief and because such claims were moot. Thus, all that remained were the claims of Nelsen and Bullene for monetary damages, which the court held did not suffice for class certification.

We review the district court's denial of class certification for an abuse of discretion. *Siles v. ILGWU National Retirement Fund*, 783 F.2d 923, 926 (9th Cir.1986). In order to decide whether the district court abused its discretion, we must determine whether the court applied the proper legal criteria. *Hatch v. Reliance Insurance Co.*, 758 F.2d 409, 416 (9th Cir.), *cert. denied*, 474 U.S. 1021, 106 S.Ct. 571, 88 L.Ed.2d 555 (1985). We review the district court's decision on standing de novo. *LaDuke v. Nelson*, 762 F.2d 1318, 1322 (9th Cir.1985) (*LaDuke*).

II

Standing "is a jurisdictional element that must be satisfied prior to class certifi-

cation." *Id.* at 1325. "A litigant must be a member of the class he or she seeks to represent at the time the class action is certified by the district court." *Sosna v. Iowa,* 419 U.S. 393, 403, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975) (*Sosna*). This, in turn, requires the litigant to "establish[ ] the requisite of a case or controversy with the defendants." *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974) (*O'Shea*). If the litigant fails to establish standing, he may not "seek relief on behalf of himself or any other member of the class." *Id.*

The district court, relying primarily upon *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 1664, 75 L.Ed.2d 675 (1983) (*Lyons*), concluded that Nelsen and Bullene lacked standing to claim injunctive relief because they "failed to make a reasonable showing that they will again be subjected to the allegedly harmful conditions at the [Center]." Nelsen and Bullene dispute this conclusion, claiming that they presented evidence that there was a "demonstrated possibility" they would again be subjected to the alleged privations in the Center.

While it is generally acknowledged that the threat of future harm may confer standing on a litigant, the degree of threat that is required has never been precisely articulated. As we recognized in *Sample v. Johnson,* 771 F.2d 1335, 1340 (9th Cir. 1985) (*Sample*):

> There has been scant analysis of what must be shown to establish that a plaintiff will likely be injured again. The Supreme Court has stated that plaintiffs must demonstrate that a "credible threat" exists that they will again be subject to the specific injury for which they seek injunctive or declaratory relief. *Kolender v. Lawson,* 461 U.S. 352, 355 n. 3 [103 S.Ct. 1855, 1857 n. 3, 75 L.Ed.2d 903] (1983). A reasonable showing of a "sufficient likelihood" that the plaintiff will be injured again is necessary. *Lyons,* 461 U.S. at 108, 111 [103 S.Ct. at 1668, 1670]. The "mere physical or theoretical possibility" of a challenged action again affecting the plaintiff is not sufficient. *Murphy v. Hunt,* 455 U.S. 478,

> 482 [102 S.Ct. 1181, 1183, 71 L.Ed.2d 353] (1982).... There must be a "demonstrated probability" that the plaintiff will again be among those injured.

(Citations partially omitted.) Whether the standard employed is defined as "credible threat," "sufficient likelihood," or "demonstrated probability," our analysis is assisted by a few basic principles that serve to guide our inquiry.

First, the interest required of a litigant to attain standing is essentially the same as the interest required to maintain a claim under the mootness doctrine. *See United States Parole Commission v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980) (" 'The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness),' "), *quoting* Monaghan, *Constitutional Adjudication: The Who and When,* 82 Yale L.J. 1363, 1384 (1973); *Sample,* 771 F.2d at 1339.

Second, regardless of how the test is characterized, our analysis cannot be reduced to considering probability merely in terms of quantitative percentages. As we explained in *Sample,* "[t]he cases have ... not indicated what *degree* of probability is required where a plaintiff can show a likely recurrence of injury.... [W]e prefer to describe 'probability' qualitatively, as requiring a very significant possibility, and not quantitatively, as mandating a 'greater than fifty percent' likelihood." 771 F.2d at 1343. In *Sample,* we concluded that the statistical probability that a plaintiff would be harmed simply because he "had returned to work in a hazardous profession" could not confer standing since the "level of generality" at which such a showing was made was "insufficient to establish that serious injury will probably recur to [the plaintiff]." *Id.* Thus, under *Sample,* what a plaintiff must show is not a probabilistic estimate that the general circumstances to which the plaintiff is subject may produce future harm, but rather an individualized showing that there is "a very significant possibility" that the future harm will ensue. *Id.; see also id.* at 1339

("The question ... is whether the practices to which the plaintiffs object are capable of repetition *as to them*.") (emphasis in original).

Third, we have recognized that there is a trend towards imposing tighter restrictions on claims of standing for injunctive claims predicated upon allegedly recurrent injuries. In *Sample,* we stated that in the mid–1970's "commentators could argue with some authority that judicial economy or the importance of the question presented may outweigh the need for anything more than the 'mere possibility' that the plaintiff had a continuing personal stake in securing injunctive or declaratory relief." *Id.* at 1342. Yet by the mid–1980's, a trend towards stricter standing requirements in this context had clearly emerged: "Cases such as *Lyons* and *LaDuke* make it clear that, no matter how important the issue or how likely that a similar action will be brought, a court is without jurisdiction if there is not a sufficient likelihood of recurrence with respect to the party now before it." *Id.* (citations omitted).

Fourth, the Supreme Court has concluded that past exposure to harm is largely irrelevant when analyzing claims of standing for injunctive relief that are predicated upon threats of future harm. In *O'Shea,* the Court considered a challenge to the standing of named plaintiffs who alleged that various officials in Cairo, Illinois were systematically engaged in practices that violated their civil rights and the rights of members of their class. 414 U.S. at 491, 94 S.Ct. at 673. In a situation virtually identical to the one before us, the Court observed that "[n]either the complainant nor respondents' counsel suggested that any of the named plaintiffs at the time the complaint was filed were themselves serving an allegedly illegal sentence or were on trial or awaiting trial before petitioners." *Id.* at 496, 94 S.Ct. at 676. Despite this lack of immediate injury, the plaintiffs, like Nelsen and Bullene, argued that they had, in the past, "suffered from the alleged unconstitutional practices" and were therefore entitled to equitable relief. *Id.* at 495, 94 S.Ct. at 676. The Court responded to this argument by stating that "[p]ast expo-

sure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.* at 495–96, 94 S.Ct. at 675–76. Thus, under this standard, Nelsen and Bullene's alleged past exposure to harm is not sufficient to confer standing. Indeed, Nelsen and Bullene have failed to demonstrate that their stays in the Center have caused any "continuing, present adverse effects." *Id.* Our analysis must therefore focus exclusively on whether there exists a threat of future harm as to either of them.

Finally, "the burden [of] showing a likelihood of recurrence [is] firmly on the plaintiff." *Sample,* 771 F.2d at 1342; *Lyons,* 461 U.S. at 101–02, 103 S.Ct. at 1664–65. It is therefore up to Nelsen and Bullene to demonstrate that the requisite threat of future harm actually exists.

Nelsen and Bullene argue that they have met their burden because they "have demonstrated a probability that they will return to the [Center] in the future." They claim that this probability is shown by their own assertions that they may have to return to the Center in the future and by the declaration of Dr. Mulholland that 35% of the inpatient (apparently such as Nelsen and Bullene) and 75% of the patients in the "recovery house" program repeat the program at Cedar Hills. Dr. Mulholland based his testimony on a report to the Mayor of Seattle entitled "A Comprehensive Review of Treatment and Service Programs Used by Seattle's Downtown Indigent Alcoholics" (Report). The County has not contested the percentages given by Dr. Mulholland and there are thus unchallenged statistics that Nelsen and Bullene may return to the Center.

Yet as we observed earlier, we cannot base a determination of standing upon a naked statistical assertion. Our analysis must be individualized and must consider all the contingencies that may arise in the individual case before the future harm will ensue. Therefore, we need not determine whether an asserted 35%, or even 75%, probability of returning to the Center is sufficient to confer standing. Rather, look-

ing beyond these percentages and beyond the conclusory assertions of Nelsen and Bullene, the district court must make an individualized inquiry into whether there is a credible threat that Nelsen and Bullene will again suffer the harm that allegedly occurred to them in the Center.

The record discloses that Nelsen and Bullene's claim of standing is more conjectural than the statistics might indicate. In order to reenter the Center, Nelsen and Bullene would have to remain within King County, remain indigent, begin drinking uncontrollably several years after their discharge from the Center (and after they have testified that they are *recovering* alcoholics) commit an alcohol-related offense, be prosecuted for that offense, be convicted, be offered the choice to reenter the Center, make that choice, *and* find that the conditions at the Center were the same as they allegedly were when Nelsen and Bullene were there in 1985 and 1986.

Although not argued by Nelsen and Bullene, they might alternatively seek voluntary commitment to the Center pursuant to Revised Code of Washington Annotated § 74.50 (West 1989 Supp.), but this would require them to resume their uncontrollable drinking, make the choice to seek treatment, establish requirements of residency and indigency, and further establish that they were "incapacitated from gainful employment due to ... alcohol abuse or addiction." R.C.W. § 74.50.050. Even if Nelsen and Bullene could meet these requirements, recommitment into the Center is far from certain. The statute states only that treatment *"may* include" inpatient or recovery house programs and does not specify a particular treatment center. *Id.* (emphasis added). Furthermore, the statute contemplates the existence of a "waiting list," suggesting that even if Nelsen and Bullene met all the above-mentioned requirements, there might not be enough space for their residency. *See id.* Finally, the fact that Nelsen sought treatment in other programs before entering the Center further lowers the possibility that he will necessarily choose to return to the Center should he suffer a relapse.

Thus, under either possible scenario, the threat of future harm to Nelsen and Bullene is based upon an extended chain of highly speculative contingencies, all of which would have to be fulfilled in order to have the threat of returning to the Center become manifest. The case law plainly demonstrates that we cannot find standing under such circumstances.

Both the Supreme Court and our circuit have repeatedly found a lack of standing where the litigant's claim relies upon a chain of speculative contingencies, particularly a chain that includes the violation of an unchallenged law. In *Lyons*, the Supreme Court considered whether an individual who had previously been subjected to a chokehold by the Los Angeles police possessed standing to sue to enjoin the police department from using the chokehold in the future. Confronted with such a highly speculative claim, the Court concluded: "We cannot agree that the 'odds' that Lyons would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation whatsoever are sufficient to make out a federal question of equitable relief." 461 U.S. at 108, 103 S.Ct. at 1668 (citations omitted). The "odds" that Nelsen and Bullene will fulfill all the contingencies necessary to revisit the Center are equally unlikely.

In *O'Shea*, the Supreme Court confronted a similar fact pattern. After determining that past exposure to harm would not be sufficient for standing, the Court turned to the prospects of the plaintiffs suffering future harm. The Court delineated contingencies, similar to those set forth by Nelsen and Bullene, that would have to ensue before the threat of recurrent injury would become a reality: *"[I]f* respondents proceed to violate an unchallenged law and *if* they are charged, held to answer, and tried in any proceedings before petitioners, they will be subjected to the discriminatory practices that petitioners are alleged to have followed." 414 U.S. at 497, 94 S.Ct. at 676 (emphasis in original). The Court reasoned that "attempting to anticipate whether and when these respondents will be charged with crime and will be made to appear

before either petitioner takes us into the area of speculation and conjecture" and held that such speculation and conjecture did not suffice to confer standing. *Id.* The Court's holdings in *Lyons* and *O'Shea* plainly demonstrate that a claim of standing which is not only speculative, but is predicated upon the violation of an unchallenged law is insufficient. *See also La-Duke,* 762 F.2d at 1326. Indeed, if we assume that Nelsen and Bullene must commit an alcohol related offense in order to return to the Center, their claim of standing is even more attenuated than the one examined in *O'Shea* since they would not only have to be arrested and tried, but *also* be convicted, sentenced, and given a choice of alternative punishments.

Moreover, the Supreme Court's rejection of highly attenuated and contingent claims in *O'Shea* and *Lyons* demonstrates that the possibility that Nelsen and Bullene might reenter the Center through noncriminal means is also insufficient for purposes of standing. The Supreme Court and our court have repeatedly recognized that claims predicated upon such "speculative contingencies afford no basis for finding the existence of a continuing controversy as required by article III." *Lee v. Schmidt–Wenzel,* 766 F.2d 1387, 1390 (9th Cir.1985) (*Lee*). *See, e.g., Rizzo v. Goode,* 423 U.S. 362, 371–73, 96 S.Ct. 598, 604–05, 46 L.Ed.2d 561 (1976) (claim of standing for injunctive relief against officers for constitutional violations held too speculative where "the individual respondents' claim to 'real and immediate' injury rests not upon what the named petitioners might do to them in the future ... but upon what one of a small, unnamed minority of policemen might do to them in the future because of that unknown policeman's perception of departmental disciplinary procedures."); *Golden v. Zwickler,* 394 U.S. 103, 109, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969) (claim of standing held too speculative where petitioner sought a declaratory judgment that he could distribute handbills against a congressional candidate and where "the prospect was neither real or immediate of a campaign involving the Congressman"); *Coverdell v. Department of Social and*

*Health Services,* 834 F.2d 758, 766 (9th Cir.1987) (mother's claim of standing to sue to enjoin social worker from taking away her children held too speculative because she failed to show that she would bear another child, "that she resided within the [social worker's] service region, or that the [social worker] had taken any action or made any statement to suggest that [the mother's] newborn children might be seized in the future."); *Del Percio v. Thornsley,* 877 F.2d 785, 787 (9th Cir.1989) (claim of standing for injunctive and declaratory relief held too speculative where teacher "ha[d] not established that it [was] likely that she [would] be subjected to disciplinary proceedings ... in the near future."); *Lee,* 766 F.2d at 1390–91 (case mooted where plaintiff failed to demonstrate a "reasonable expectation" that the challenged shareholders meeting would occur again where it depended upon four separate contingencies and it was "difficult to see how [the plaintiffs] could realistically ever bring this about, even assuming they chose to do so."); *Portland Police Association v. City of Portland,* 658 F.2d 1272, 1274 (9th Cir.1981) (police officers' claim of standing too speculative where "the officer must be in a 'major incident'; ... must be at least partly culpable for its occurrence; ... must request counsel; ... that request must be denied or counsel must otherwise be supplied; and, finally, disciplinary or criminal proceedings must be instigated for either failure to complete reports or because the utterance of incriminating statements during the report process."); *City of South Lake Tahoe v. California Tahoe Regional Planning Agency,* 625 F.2d 231, 238–39 (9th Cir.), *cert. denied,* 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980) (city council members' claims of standing "too speculative" when predicated upon the fear that by passing certain laws they might be violating their oaths to uphold the Constitution); *Stewart v. M.M. & P. Pension Plan,* 608 F.2d 776, 784–85 (9th Cir. 1979) (claim of standing to sue trustees of pension plan too speculative because "[a]ny number of things can and doubtless will, happen between now and the future date of

[plaintiff's] retirement and these may well affect that event.").

In those circumstances where we, or the Supreme Court, have found standing to exist for a threat of future harm, it has consistently been determined that some systematic pattern, repetition or relationship exists. In *LaDuke*, for example, we considered a challenge to the standing of migrant farm dwellers whom the Immigration and Naturalization Service had subjected to a continuing pattern of warrantless house searches. 762 F.2d at 1321. After distinguishing *Lyons*, we held that "[t]he evidence presented at trial reveals that the plaintiff faces credible threat of recurring injury." *Id.* at 1326. In particular, we observed that "[t]he systematic pattern finding of the district court, the official INS policy for the conduct of ranch checks, and the district court's finding of likely recurrence all reinforce the reality and immediacy of the plaintiff's constitutional claims." *Id.; see also Kolender v. Lawson*, 461 U.S. 352, 355 n. 3, 103 S.Ct. 1855, 1857 n. 3, 75 L.Ed.2d 903 (1983) ("credible threat" found where plaintiff "ha[d] been stopped on approximately 15 occasions pursuant to [the challenged statute] ... in a period of less than two years."); *Bledsoe v. Webb*, 839 F.2d 1357, 1361 (9th Cir.1988) (female civilian employee of the Navy had standing to bring Title VII action based on her continuing status in which she "remain[ed] employed by the Department of the Navy, reliant on sea trial assignments for advancement as well as equitable pay, and subject to reassignment aboard Navy vessels ... (the maintenance of which provides the basis for her employment)."); *Doe v. Gallinot*, 657 F.2d 1017, 1021 n. 6 (9th Cir.1981) (claim not mooted where plaintiff had been returned to challenged confinement *six times* after initiation of litigation).

Nelsen and Bullene have failed to demonstrate any such systematic pattern or policy that would suggest that their return to the Center is inevitable. Their claim is thus distinguishable from *LaDuke* and similar cases. Instead of proving a regular pattern of harm to which they are subject, Nelsen and Bullene's complaints for injunctive relief consist only of a set of highly speculative contingencies. Their claims are thus analogous to those ruled upon in *Lyons, O'Shea*, and similar cases. We conclude that Nelsen and Bullene have not met their burden of showing a credible threat of immediate future harm.

### III

Nelsen and Bullene argue that this case is governed by the "capable of repetition, but evading review" doctrine. *See Moore v. Ogilvie*, 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969) (*Moore*); *Sosna*, 419 U.S. at 399–400, 95 S.Ct. at 557–58. While, as we have discussed, the standards for evaluating the threat of future harm under the standing and mootness doctrines are similar, the "capable of repetition but evading review" doctrine is an exception only to the mootness doctrine; it is not transferable to the standing context. This exception governs cases in which the plaintiff possesses standing, but then loses it due to an intervening event. *See, e.g., Sosna*, 419 U.S. at 399, 95 S.Ct. at 557 (claim held capable of repetition but evading review where plaintiff satisfied the challenged durational residency requirement during the course of litigation); *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973) (claim held capable of repetition but evading review where mother challenging abortion statute gave birth to child before case reached Supreme Court); *Moore*, 394 U.S. at 815–16, 89 S.Ct. at 1494–95 (claim held capable of repetition, yet evading review where challenged state election occurred during pendency of litigation). Since Nelsen and Bullene did not have standing in the first place, their invocation of this exception is not warranted.

### IV

Because Nelsen and Bullene did not possess the requisite standing to assert a claim of injunctive relief, the district court did not abuse its discretion in denying their motion for class certification and properly dismissed their equitable claim. This left

only their individual claims against the Center for money damages. Class certification under Fed.R.Civ.P. 23(b)(2) is not appropriate where the relief requested relates "exclusively or predominately to money damages." *Williams v. Owens–Illinois, Inc.*, 665 F.2d 918, 929 (9th Cir.), *cert. denied*, 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982); *Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1314 (9th Cir.1977). We hold that it was not an abuse of discretion for the district court to refuse to certify a class after determining that the named plaintiffs possessed no standing to pursue injunctive relief.

AFFIRMED.

PREGERSON, Circuit Judge, dissenting:

I do not disagree with the majority's analysis of the law. I do disagree, however, with its application to the facts of this case. Appellants are indigent, confirmed alcoholics. The probabilities are strong that they will stay in King County, that they will again indulge in alcohol, that they will be arrested, and that they will return to the Cedar Hills Treatment Center.

The plaintiffs cite unchallenged statistics that they have a 35% to 75% chance of returning to the drug treatment facility. The majority argues that a standing determination may not be made on the basis of such "naked statistical assertions." True, we have in this circuit expressed a preference "to describe 'probability' qualitatively, as requiring a very significant possibility, and not quantitatively, as mandating a 'greater than fifty percent' likelihood." *Sample v. Johnson*, 771 F.2d 1335, 1343 (9th Cir.1985). Such a preference does not, however, obviate all use of statistical information. Statistical information goes far in supporting *qualitative* determinations of probability, particularly in cases such as these.

Given the social and medical conditions of the appellants lives, conditions supported by the analysis of official government reports, there is indeed a qualitative probability that the alleged harm will recur. The appellants have established there is a credible threat they will again suffer the harm they have alleged. We are not here dealing with mere physical or theoretical possibilities. I would therefore reverse the district court's dismissal of appellants' claims.